**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

STACKPOLE INT'L ENGINEERING, LTD.,

     Plaintiff,

v.                                       Case No. 17-13748

ANGSTROM AUTOMOTIVE GROUP LLC,
and ANGSTROM PRECISION METALS LLC,

     Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT WITHOUT PREJUDICE**

In this contract dispute regarding the supply of automotive parts, Plaintiff alleges claims for breach of contract, breach of warranty, and claim and delivery. (Dkt. # 1.) Currently pending before the court is Defendants' motion to dismiss (Dkt. #11) and Plaintiff's partial motion for summary judgment (Dkt. #14.) Both motions have been fully briefed. The court has reviewed the briefing on both motions and concludes a hearing is unnecessary. *See* E.D. Mich. R. 7.1(f)(2). The court will grant Defendants' motion to dismiss in part and deny Plaintiff's motion for summary judgement without prejudice.

## I. BACKGROUND

Defendant Angstrom Automotive Group LLC ("AAG") is the parent company of Defendant Angstrom Precision Metals LLC ("APM"), an automotive parts supplier to Plaintiff Stackpole International Engineered Products ("Stackpole"). Plaintiff incorporates Defendants' parts into larger parts and sells those larger parts to Original Equipment

Manufacturers ("OEMs") which, in turn, produce automobiles to be sold to end consumers.

In 2014, Plaintiff Stackpole and Defendant AAG signed a Letter of Intent ("LOI") in which Plaintiff awarded Defendants contracts for two new parts programs and extended the parties' contract for one preexisting program. The LOI includes a description of the parts to be provided, the production volume, and the price per part. It does not contain a supply duration or specify the manufacturing process to be used.

The LOI states that official Plaintiff purchase orders "will be issued at a later date to allow for actual shipments." (Dkt. # 1-1.) The LOI directs AAG to begin tooling for the parts as to meet the projected milestones once orders issue. According to Plaintiff, AAG's subsidiary APM purported to fulfill its obligations under the LOI. (Dkt. # 1, Pg. ID 5.) Plaintiff subsequently issued purchase orders to APM. (Dkt. # 1-2, 1-3, 1-4.)

The purchase orders ("POs") reflect the terms of the LOI and reference the LOI expressly. Plaintiff also included a terms & conditions sheet ("T&C") attached to the orders. The T&Cs contain a number of additional terms including an express warranty. Additionally, Plaintiff issued a PO for the tooling necessary to manufacturer the parts it ordered. (Dkt. # 1-5.) For one of the tooling orders, known as the 10 R parts tooling, Plaintiff paid APM only a portion of the cost of the tooling with an agreement that the last 1/3 of the payment would be made "at the end of the parties' relationship." (Dkt. # 1, Pg. ID 7.) APM proceeded to fill the orders as agreed for many years.

In early 2017, APM started supplying fewer parts than ordered and missed some ordered shipments altogether. (Dkt. # 1, Pg. ID 7–8.) According to Plaintiff, APM informed Plaintiff it was losing money and needed to increase the price of the parts by

100-120%. (*Id.* at Pg. ID 8.) Plaintiff refused to pay the increase and insisted that APM was bound by the LOI. APM asserted that the LOI was an at-will contract and APM could cancel it with reasonable notice. Instead of canceling the contract, APM asserts that it wanted to reform the contract.

The parties had many discussions, but never reached agreement. As early as April 2017, APM warned it would not continue to supply parts at the original price. (*Id.*)

In June 2017, APM stopped shipping parts to Plaintiff who, in fear of not being able to meet its own contractual obligations to its OEMs, signed a new contract agreeing to APM's price increase, but did so explicitly under protest. (*Id.* at Pg. ID 11.) The new contract, named the "Wind-Down Agreement," was back-dated to go into effect May 1, 2017. The Wind-Down Agreement dictated that the parties' contractual relationship would terminate on September 30, 2017.

After signing the Wind-Down Agreement, APM shipped an order to Plaintiff in which nearly 40% of the parts were defective. (*Id.*) An independent inspector confirmed the defect. (*Id.* at Pg. ID 12.) Stackpole was unable to use these parts. (*Id.*)

Plaintiff filed this action and asserts claims for breach of contract, breach of warranty, and claim and delivery under Michigan law for tooling and parts it ordered but never received from Defendants. Plaintiff seeks to recover the price increase it paid under the Wind-Down Agreement as well as the full price it paid for the defective parts and the tooling.

Defendants filed a motion to dismiss Plaintiff's complaint and Plaintiff filed a pre-discovery motion for partial summary judgment.

## II. STANDARD

## A. Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief may be granted. Under the Rule, the court construes the complaint in the light most favorable to the plaintiff and accepts all well-pleaded factual allegations as true. *Barber v. Miller*, 809 F.3d 840, 843 (6th Cir. 2015).

Federal Rule of Civil Procedure 8 requires a plaintiff to present in her complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint must provide sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Boland v. Holder*, 682 F.3d 531, 534 (6th Cir. 2012) (emphasis removed) (citing *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007)). Determining whether a complaint states a plausible claim for relief is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

### B. Motion for Summary Judgment

A party is entitled to summary judgment if he shows that there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the court considers "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). The evidence, and all reasonable inferences drawn from it, must be considered in the light most favorable to the nonmoving party. *Moran v. Al Basit LLC*, 788 F.3d 810, 817 (6th Cir. 2015). "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute of material fact exists. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017) (quoting *Liberty Lobby*, 477 U.S. at 243)).

The movant has the initial burden of showing—pointing out—the absence of a genuine dispute as to any material fact; i.e., "an absence of evidence to support the nonmoving party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). The burden then shifts to the nonmoving party to put forth enough evidence to raise a genuine issue of material fact for trial. *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248; *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017). Not all factual disputes are material. A fact is "material" for purposes of summary judgment when proof of that

fact would establish or refute an essential element of the claim "and would affect the application of the governing law to the rights of the parties." *Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013). A "mere 'scintilla' of evidence" supporting the nonmoving party's position will not defeat a properly-supported motion for summary judgment. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (quoting *Liberty Lobby*, 477 U.S. at 251).

## III. DISCUSSION

The parties' dispute is before the court under its diversity jurisdiction; therefore, the court will apply Michigan law to the case. To bring a claim for breach of contract under Michigan law, the party must prove that, "(1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014). "A valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Bank of Am., NA v. First Am. Title Ins. Co.*, 878 N.W.2d 816, 830 (Mich. 2016). "[T]he damages recoverable for breach of contract are those that arise naturally from the breach or those that were in the contemplation of the parties at the time the contract was made." *Kewin v. Massachusetts Mut. Life Ins. Co.*, 295 N.W.2d 50, 52–53 (Mich. 1980); *see also Lawrence v. Will Darrah & Assocs., Inc.*, 516 N.W.2d 43, 48 (Mich. 1994).

### A. Plaintiff has plausibly alleged that AAG is a party to the contract

The Michigan Supreme Court mandates that "unambiguous contracts are not open to judicial construction and must be enforced as written." *Rory v. Cont'l Ins. Co.*,

703 N.W.2d 23, 30 (Mich. 2005). An unambiguous contractual provision is enforced as written unless it "would violate law or public policy." *Id.* at 31. "In ascertaining the meaning of a contract, [the court] give[s] the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Jawad A. Shah v. State Farm Mut. Auto. Ins. Co,* No. 340370, 2018 WL 2121787, at *5 (Mich. Ct. App. May 8, 2018) (quoting *Rory*, 703 N.W.2d at 28).

"A letter of intent may be characterized as an agreement to agree at a later date and is as valid as any other contract." *Zander v. Ogihara Corp.*, 540 N.W.2d 702, 705 (1995) (citing *Opdyke Inv. Co. v. Norris Grain Co.*, 320 N.W.2d 836 (1982)). "The fact that additional contracts may have been contemplated and mentioned in the letter does not invalidate any agreement actually reached." *Opdyke*, 320 N.W.2d at 838. A contract may be formed "despite some terms being incomplete or indefinite so long as the parties intended to be bound by the agreement." *Calhoun Cty. v. Blue Cross Blue Shield Michigan*, 824 N.W.2d 202, 210 (Mich. Ct. App. 2012). A contract is formed as long as "no essential terms [are] left to be negotiated in the future by the parties." *Pittman v. Experian Info. Sols., Inc.*, No. 17-1677, 2018 WL 4016604, at *8 (6th Cir. Aug. 23, 2018) (applying and relying on Michigan law).

The parties' LOI is attached to and relied upon in Plaintiff's complaint. *See Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) ("In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although . . . exhibits attached to the complaint, also may be taken into account."). It is addressed to Plaintiff's purchasing manager and to AAG's Vice President of Business Development. (Dkt. # 1-2, Pg. ID 19.) The LOI states:

> Please accept this letter as confirmation that Stackpole International –
> Engineered Products Division, has awarded Angstrom Automotive Group
> with the production of 1.1M volume of the 10R/10L Pump Shaft and the
> production of 306k volume of the Nano Pump Shaft.

(Dkt. # 1-2, Pg. ID 19.) The LOI includes information about the various parts to be produced, the price, the quantity, the start production date, and other details concerning the parties' relationship. The LOI concludes: "On behalf of Stackpole International, we look forward to working together with you on this project. Please sign and date page two of this document confirming you agree with all items listed above." (*Id.* at Pg. ID 20.) The letter is hand-signed by AAG's Vice President of Business Development. (*Id.*)

Defendant AAG asserts that Plaintiff has failed to allege a breach of contract claim against it because Plaintiff has not plausibly alleged that AAG was a party to any contract with Plaintiff. The court disagrees.

Based on the pleadings, which the court accepts as true for the purpose of assessing the present motion, the LOI contains all of the essential elements to form a contract between AAG and Stackpole for the purchase of parts and tooling for those parts under Michigan law. The unambiguous language of the LOI indicates an intention by both parties to be bound and to begin performance. (Dkt. # 1-2. Pg. ID 20) (stating that acceptance of the LOI serves as authorization to proceed with tooling in order to meet project milestones). While the LOI contains references to future orders for actual shipments and also references work to be performed specifically by APM, these facts are not inconsistent with contract formation.

Plaintiff's complaint alleges that AAG chose to fulfil its obligations under the LOI through purchase orders to APM. (Dkt. # 1, Pg. ID 5.) Stackpole subsequently issued purchase orders to APM. (Dkt. # 1-3, 1-4, 1-5.) The purchase orders reflect the terms of

the LOI and reference the LOI expressly. (*Id.*) The court concludes that Plaintiff's claim for breach of contract against Defendant AAG "has facial plausibility" because Plaintiff has pled "factual content that allows the court to draw the reasonable inference" that AAG was a party to the LOI contract. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

### B. Plaintiff has plausibly alleged that Defendants breached the parties' contract by failing to properly terminate it until Sept. 30, 2017

The Michigan Uniform Commercial Code provides that

> Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.

Mich. Comp. Laws § 440.2309(2). The Code further states in subsection 3 that termination by one party "except on the happening of an agreed event requires that reasonable notification be received by the other party." Mich. Comp. Laws § 440.2309(3). Comment 8 of the Code clarifies that,

> Subsection (3) recognizes that the application of principles of good faith and sound commercial practice normally call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement.

Mich. Comp. Laws § 440.2309 cmt. 8. Comment 10 further explains

> The requirement of notification is dispensed with where the contract provides for termination on the happening of an "agreed event." "Event" is a term chosen here to contrast with "option" or the like.

Mich. Comp. Laws § 440.2309 cmt. 10. The Michigan UCC explains that in general, "[w]hether a time for taking an action required by this act is reasonable depends on the nature, purpose, and circumstances of the action." Mich. Comp. Laws § 440.1205(1).

Both parties agree that in early April 2017, Defendants notified Plaintiff that they would terminate production absent a change in contract terms. (Dkt. # 1, Pg. ID 7-8.) In the following month, the parties entered into a new agreement with—higher prices—effective May 1, 2017. The new agreement, called the "Wind-Down Agreement," set a termination date of September 30, 2017.

Defendants argue that Plaintiff cannot maintain a claim for breach of contract because Defendants properly terminated the contract even under the facts alleged by Plaintiff. According to Defendants, the Wind-Down Agreement served as the "reasonable notice" of termination required under Michigan law to end a contract at will.

Plaintiff responds and argues that the original contract was not at-will or indefinite, but rather was for a set term, namely the duration of the identified parts' programs. Because contracts for a set duration cannot be terminated at will, even with reasonable notice, Plaintiff argues that Defendants are liable for Plaintiff's costs associated with the identified parts' programs through the life of those programs.

The LOI "is [a] contract [that] provides for successive performances." *See* Mich. Comp. Laws § 440.2309(2). The question is whether the LOI is "for an indefinite duration" such that subsection 2 of Michigan's UCC allowing for termination "at any time by either party" applies to it. *Id.* The duration of the contract is the time period during which the parties are obligated to perform their duties under the contract. The duration ends with the discharging of the parties' obligations, either by performance, termination, or breach. *See* Discharge, Black's Law Dictionary (10th ed. 2014). When a contract does not specify when the parties' duties are discharged, then it is for an indefinite duration.

To determine when the parties' obligations are discharged, the court begins by determining the parties' respective obligations under the contract. In the LOI, Stackpole awarded Defendants the production of the "10 R Program" and the "Nano Program" pursuant to the "attached quote" for each program. (Dkt. # 1-2, Pg. ID 19.) Specifically, Defendants agreed to produce and sell up to 1.1 million of the 10R program parts at $1.66 per part and up to 306,000 of the Nano program parts at $3.08 per part to Plaintiff. (*Id.*) The attached quotes confirm these details regarding the parts without mention of the specific programs. (Dkt. # 19-2, 19-3); *see Commercial Money Ctr. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007) ("[W]hen a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment."). Defendants also agreed to provide a "price reduction for the next three years (2015, 2016 and 2017) on current T70 shaft business." (*Id.*)

Plaintiff agreed to begin issuing orders for the 10R program and Nano program parts and to provide certain productivity reimbursements to Defendant in the event it did not issue and pay for orders constituting 80% of the parts within the first year of production of each part. (*Id.* at Pg. ID 19–20.)

Having identified the parties' contractual obligations, the court must next determine whether the contract dictates when the parties are relieved from these obligations, i.e., when their duties are discharged.

The LOI does not explicitly state the duration of the parties' agreement nor discuss when the parties' duties under the contract will be fulfilled or discharged. The

contract also does not include a termination provision or any language remotely indicating that one party may terminate the relationship under particular circumstances.

The contract could be discharged if Defendants were to produce the full volume of the parts agreed upon; however, nothing obligates Plaintiff to issue orders up to the full production volume. In contrast, the LOI contemplates that Plaintiff may never issue purchase orders for the full volume,

> Selling price for Nano program will be $3.08 for 306k volume . . . Productivity would start Jan. 1, 2016 with the understanding that the program needs to achieve 80% of the 306,000 in CY2016. In the event the program does not achieve the 80% of the 306,000 in the calendar year, Stackpole would reimburse APM the productivity provided back to Jan 1 of that year.

(Dkt. # 13, Pg. ID 135.)

There are several factual scenarios where Defendants would never produce the full volume of parts specified in the LOI. For instance, the OEMs managing the programs that require the parts Plaintiff orders from Defendants may never need the full volume of the parts stated in the LOI because they may discontinue the programs before reaching that need. Similarly, Plaintiff could choose to discontinue its relationship with the pertinent OEMs at any time regardless of whether the OEMs ended the parts programs. Under those circumstances, Plaintiff presumably would not continue placing orders for parts with Defendants regardless of whether the full volume had already been produced.

In sum, the LOI does not dictate when the parties' contractual obligations are discharged, and instead contemplates a perpetual relationship. The duration of the parties' obligations cannot be defined based on the language of the LOI. Defendants are correct to interpret the contract as one for an indefinite duration.

Plaintiff argues that the parties' obligations under the LOI are tied to a definite duration—until the "end of the particular automotive program at issue." (Dkt. # 13, Pg. ID 134-35.) There is nothing in the LOI's language that binds Defendants to provide parts for the life of the OEMs' programs. Plaintiff attempts to read this term into the contract by citing the LOI's references to the "10R program" and the "Nano program." These references provide context for the parts at issue, but Plaintiff reaches beyond the unambiguous terms of the contract when it imports a life-of-the-program duration provision into the LOI. *See Rory*, 703 N.W.2d at 30 (holding that courts must enforce unambiguous contracts as written). To the contrary, Defendants are obligated to provide only a limited volume of each part. The attached quotes identified in the LOI confirm the volume limitations and are devoid of any mention of the particular programs. (Dkt. # 19-2, 19-3); *Forge v. Smith*, 580 N.W.2d 876, 881 (1998) ("Where one writing references another instrument for additional contract terms, the two writings should be read together."). As an illustration, consider that the OEMs could extend the life of the pertinent programs such that they would require more parts than the volume agreed upon in the LOI and Defendants would not be obligated to meet that supply demand.

Plaintiff also relies upon the mentioning of future dates in the contract as evidence that it is intended to extend for the life of the parts' programs. Specifically, the LOI establishes that various terms become active at various dates. (Dkt. # 1-2, Pg. ID 19.) Plaintiff's argument is unpersuasive because the discussion of future dates is entirely consistent with a perpetual contractual relationship. As Defendants explain, these terms are "premised on the condition that the relationship [is] in existence at the time" they would become effective. (Dkt. # 19. Pg. ID 355.) For example, the LOI's

statement that "productivity giveback will be 1.5% each year for three years" does not require the contract to extend for three years, but rather informs that the 1.5% rate applies to the contract to the extent that the contractual relationship is in existence in any of the next three years. (Dkt. # 1-2, Pg. ID 19.) Without more, the LOI's refences to future dates does not obligate the contract to continue through those dates. The LOI is neither discharged nor terminable upon the end of the OEMs' parts programs and otherwise fails to specify its duration. The court finds the contract is for an indefinite duration.

Michigan law permits contracts for successive performances over an indefinite duration to be terminated by either party with reasonable notice. *See* Mich. Comp. Laws § 440.2309(2)–(3). At minimum, Defendants gave notice by May 1, 2017 that they were going to terminate the parties' relationship on September 30, 2017. Plaintiff does not dispute that the five-months' notice allowed it to find an alternative supplier nor that such notice is reasonable under the law. (Dkt. # 1, Pg. ID 12; Dkt. # 13, Pg. ID 131; Dkt. # 14, Pg. ID 249); *see* Mich. Comp. Laws § 440.2309 cmt. 8. Therefore, Defendants properly terminated the contract as of September 30, 2017 and cannot be held liable for breach of contract damages incurred beyond that date. The court will grant Defendants' motion to dismiss in this regard.

However, as Plaintiff points out, Defendants terminated the parties' contractual relationship long before Sept. 30, 2017; they did so on May 1, 2017. The Wind-Down Agreement, which became effective on May 1, 2017, contained terms less favorable to Plaintiff than those of the LOI. Plaintiff claims that Defendants coerced it to agree to the terms of the Wind-Down Agreement. Taking these facts as true, Plaintiff has plausibly

alleged that Defendants breached the parties' original contract on May 1, 2017 when they terminated the original contract and coerced Plaintiff to sign a new (or amended) contract. Plaintiff has plausibly alleged that Defendants did not provide reasonable notice prior to their alleged termination on May 1, 2017 as the notice given less than a month earlier was not reasonable. *See* Mich. Comp. Laws § 440.2309(3) cmt. 8. Therefore, Plaintiff has adequately pled a claim for reimbursement of the additional costs it incurred during the Wind-Down Agreement due to Defendants' breach. The court will deny Defendant's motion to dismiss in this regard.

## C. Plaintiff is not entitled to partial summary judgment on its Breach of Contract claim

Plaintiff asserts that it has done more than adequately plead its case and argues that it is entitled to partial summary judgment for the overpayments it made under the Wind-Down Agreement. (Dkt. # 14, Pg. ID 249.) The Wind-Down Agreement states:

> Stackpole enters this agreement under duress and protest, while reserving all rights, including but not limited to recovering every payment required hereunder that is in excess of the quantum that would be payable under the existing contractual terms. APM similarly reserves all of its right, remedies, claims and defenses against Stackpole.

(Dkt. # 1-5, Pg. ID 62.) Defendants signed the Wind-Down Agreement and do not dispute that Plaintiff agreed to its terms only to prevent a shut-down of their parts supply from Defendants. Defendants do not claim that they gave notice of their May 1, 2017 termination prior to April 2017. Instead, Defendants argue that Plaintiff materially breached the parties' agreement first. (Dkt. # 21, Pg. ID 400.)

Defendants allege that the prices quoted in the LOI and its attachments were based on an "Auto Process" for manufacturing the parts and that the parties intended and agreed that the Auto Process would be used to fulfill the POs. (*Id.* at Pg. ID 400–

401.) According to Defendants, Plaintiff later demanded that Defendants use a more expensive "Manual Process" for manufacturing the parts and would not allow any adjustment in the quoted prices. (Dkt. # 21-4.) Defendants argue that Plaintiff's demand for the Manual Process was a change in the original contract's terms and gave it "a right to terminate the contract or charge an increase[d] price" for use of the Manual Process. (Dkt. # 21, Pg. ID 401.) Defendants oppose Plaintiff's motion for partial summary judgment and argue that, at minimum, discovery is necessary to determine whether the parties' contract was premised on use of the Auto Process. *See* Fed. R. Civ. Pro. 56(d); (Dkt. # 21-7.)

The Michigan Supreme Court has "recognized a failure of consideration when one party has committed a first, substantial breach of a contract and sought to maintain an action against the other party for a subsequent failure to perform." *Innovation Ventures v. Liquid Mfg.*, 885 N.W.2d 861, 871 (Mich. 2016). "'When there is a failure to perform a substantial part of the contract or one of its essential items,' the courts have permitted the parties to rescind the contract." *Id.* (quoting *Rosenthal v. Triangle Dev. Co.*, 246 N.W. 182 (Mich. 1933)).

Neither the LOI nor the attached quotes specify the type of process to be utilized in the production of the parts. No discovery has occurred in this case. Accordingly, there is insufficient evidence in the record to determine whether the parties' intended for Defendants to utilize the Auto Process, Manual Process, or some other process or whether the parties never agreed to the type of production process. The answers to these questions directly bear on whether Plaintiff was enforcing, breaching, or attempting to renegotiate the parties' contract when it demanded the use of the Manual

Process. The court finds a genuine issue of material fact exists as to whether Defendant substantially breached the parties' contract prior to April 2017 and will deny Plaintiff's motion for partial summary judgment without prejudice to allow the parties to conduct discovery.

### D. Plaintiff's Terms & Conditions were not a part of the parties' contract; Plaintiff cannot maintain a claim for Breach of Express Warranty (Count II)

The Michigan UCC states

> (b) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods[.]

Mich. Comp. Laws § 440.2206(1)(b). "In a written contract a reference to another writing, if the reference be such as to show that it is made for the purpose of making such writing a part of the contract, is to be taken as a part of it just as though its contents had been repeated in the contract." *Forge*, 580 N.W.2d at 884, n. 21 (quoting *Whittlesey v. Herbrand Co.*, 187 N.W. 279 (Mich. 1922)).

The parties' Purchase Orders ("POs") state, "Not valid without signed PO supplement attachment." (Dkt # 1-3, Pg. ID 22.) The PO Supplemental Attachment, known as the Terms and Conditions ("T&C"), states:

**WARRANTY**:

> Seller expressly warrants and guarantees that all goods or services covered by this contract will conform to all specifications, drawings, samples or descriptions furnished to or provided by the Buyer or utilized by the Seller in the manufacture of said goods. Seller acknowledges that the Seller knows of Buyers intended use, and expressly warrants and guarantees that all goods covered by this contract have been selected, designed, manufactured, or assembled by the Seller based on the Buyer's intended use, will be fit and sufficient for the particular purposes intended by the Buyer.

17

(Dkt. # 1-3, Pg. ID 26.) The T&C also states:

**<u>ACCEPTANCE</u>**

Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work under this contract shall constitute Seller' acceptance of these terms and conditions only. The purchase order shall not become binding until this accompanying acknowledgement/supplemental attachment has been signed and returned.

(Dkt. # 1-4, Pg. ID 39.) The T&C was attached to each purchase order Defendants received and was signed by Plaintiff. Although Defendants fulfilled the orders, it is not disputed that they never returned a signed copy of the T&C with their shipments.

Plaintiff claims that Defendants breached the express warranty contained in the T&C when they provided nonconforming parts for the Nano parts' program. Defendants argue that the T&C is not a part of the parties' contract and, therefore, Defendants cannot be liable for allegedly breaching it.

The POs reference the T&C in a manner that indicates "that [the reference] is made for the purpose of making such writing a part of the contract" *Forge*, 580 N.W.2d at 884, because the PO and T&C both emphasize that the PO is not valid without a signed T&C. However, Defendants never signed a T&C and Plaintiff accepted their PO shipments nonetheless. As a result, the parties never reached agreement as to the T&C. Nevertheless, "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract." *See* Mich. Comp. Laws § 440.2207(3). In those instances, the parties' contract "consist of those terms on which the writings of the parties agree." *Id.*

Here, the parties agreed on the remaining terms of the POs and are bound by only those terms. Plaintiff cannot claim liability for breach of a contractual provision to which Defendants never agreed. The court will grant Defendant's motion to dismiss Plaintiff's breach of express warranty claim.

Plaintiff requests leave to amend its complaint to add a claim for breach of implied warranty. (Dkt. # 13, Pg. ID 137.) Michigan law attaches an implied warranty to the sale of goods as follows:

> Unless excluded or modified ([Mich. Comp. Laws 400] section 2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
>
> (2) Goods to be merchantable must be at least such as
>
> (a) pass without objection in the trade under the contract description; and
> (b) in the case of fungible goods, are of fair average quality within the description; and
> (c) are fit for the ordinary purposes for which such goods are used; and
> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
> (e) are adequately contained, packaged, and labeled as the agreement may require; and
> (f) conform to the promises or affirmations of fact made on the container or label if any.

Mich. Comp. Laws § 440.2314.

The court freely gives leave to amend when justice so requires. Fed. R. Civ. P. 15(a)(2). Several factors indicate that leave to amend should be given here. First, Plaintiff has provided detailed facts alleging that Defendants provided nonconforming Nano parts during the course of the Wind-Down Agreement, which inhibited Plaintiff's ability to provide timely parts to its OEMs and caused Plaintiff further monetary damages. If Plaintiff's allegations are proven true, Plaintiff paid a higher price under

duress for defective goods, and Plaintiff, and possibly its OEMs, suffered damages as a result. Without leave to amend, Defendants would escape liability for this conduct despite receiving and fulfilling multiple purchase orders with warranty terms physically attached that prohibited this conduct.

Second, Michigan has indicated the importance it places on the quality of goods sold in its state by importing an implied warranty into each sale. Defendants' alleged conduct contravenes Michigan's public policy in favor of warrantable goods.

Third, given the early stage of this case, Defendants will suffer little prejudice if amendment is allowed, especially considering that Defendants have been on notice of the alleged nonconforming goods since the inception of this case.

The court concludes that justice requires allowing the requested amendment to afford Plaintiff the opportunity to provide proofs for its claim. The court will grant leave to amend.[1]

### E. Plaintiff cannot maintain an action for claim and delivery because it admits it has not paid for the 10 R tooling in full

Michigan law provides a cause of action for claim and delivery:

> A civil action may be brought to recover possession of any goods or chattels which have been unlawfully taken or unlawfully detained and to

---

[1] Defendants briefly argue that any breach of warranty claim against them fails because the only allegedly nonconforming goods were produced during the Wind-Down Agreement and thus were governed by that Agreement's warranty terms. (Dkt. # 11, Pg. ID 101.) The court finds this unpersuasive. As explained above, *supra* Section III.B, Plaintiff alleges that the Wind-Down Agreement constituted a breach of the parties' original contract. If the court concludes that Michigan's implied warranty is applicable to the parties' original contract, then Defendants' alleged illegal termination of the original contract would not relieve them of their obligations under the warranty contained in that contract. *See* Mich. Comp. Laws § 440.1308. At minimum, Defendants would be bound by the warranty for a "reasonable time," *see* Mich. Comp. Laws § 440.2309(2), i.e., until their notice date of September 30, 2017.

recover damages sustained by the unlawful taking or unlawful detention, subject to the following conditions:

. . .

(c) An action may not be maintained under this section by a person who, at the time the action is commenced, does not have a right to possession of the goods or chattels taken or detained.

Mich. Comp. Laws § 600.2920(1)(c). The Michigan Court of Appeals has held that a party has a "right to possession" for purposes of claim and delivery only if the subject property is "independent or divisible from another's interests." *Galasso Jr., Revocable Living Trust, v. Surveybrain.com, LLC*, No. 303300, 2012 WL 1698411, at *3 (Mich. Ct. App. May 15, 2012).

Regarding tooling for the production of parts, Michigan law states:

A molder has a lien, dependent on possession, on any die, mold, or form in the molder's possession belonging to a customer for the amount due the molder from the customer for plastic fabrication work performed with the die, mold, or form. A molder may retain possession of the die, mold, or form until the amount due is paid.

Mich. Comp. Laws § 445.618.

Plaintiff admits that it has paid Defendants only $52,000 of the $77,000 owed for the 10 R parts tooling. (Dkt. # 1, Pg. ID 6-7.) Plaintiff agreed to pay the remaining $25,000 to Defendants "at the end of the parties' relationship" and instead has retained the funds because Defendants "prematurely and improperly repudiated the parties' Contract." (*Id.* at 7.)

Plaintiff has not sufficiently alleged that it has a right to possession of the 10 R parts tooling. Plaintiff's interest in the 10 R parts tooling is neither independent nor divisible from Defendants' interest in it. Plaintiff cannot presently maintain an action for claim and delivery of the 10 R parts tooling. The court will grant Defendants' motion to

dismiss without prejudice to Plaintiff's ability to replead its claim should it pay Defendants the balance of the 10 R tooling purchase price and Defendants refuse to relinquish the tooling.[2]

## IV. CONCLUSION

Defendants provided reasonable notice of their ultimate termination of the parties' relationship, which occurred on Sept. 30, 2017. However, Plaintiff has plausibly alleged that Defendants breached the parties' contract by terminating the pricing terms of the LOI on May 1, 2017 without reasonable notice. Whether Plaintiff can also establish as a matter of law that Defendants' termination was a breach remains to be seen because it requires discovery into whether Plaintiff substantially breached the parties' contract first, thereby allowing Defendants to rescind the original contract terms.

Defendants are not bound by the express warranty contained within the T&C because Defendants never signed the T&C and Plaintiff accepted their performance nonetheless. Regardless Michigan law of implied warranty may apply to the parties' contract and justice requires allowing Plaintiff to amend its complaint to add a claim based on it.

Plaintiff has not sufficiently pled that it is entitled to possession of the 10 R parts tooling because it admits that it has not paid Defendants in full for it. Accordingly,

IT IS ORDERED that Defendants' motion to dismiss (Dkt. # 11) is GRANTED in part in that Plaintiff's breach of contract claim for damages incurred beyond Septemeber 30, 2017 is DISMISSED; Plaintiff's Breach of Express Warranty claim (count II) is

---

[2] Plaintiff alleges that it paid for the Nano parts tooling in full. (Dkt. # 1, Pg. ID 6.) To the extent Plaintiff seeks claim and delivery of the Nano tooling, its claim is adequately pled and survives.

DISMISSED; and Plaintiff's action for claim and delivery (count III) is DISMISSED WITHOUT PREJUDICE as to the 10 R parts tooling. Defendants' motion to dismiss (Dkt. # 11) is DENIED in all other respects.

IT IS ORDERED that Plaintiff's motion for partial summary judgment (Dkt. # 14) is DENIED WITHOUT PREJUDICE to its ability to refile following discovery.

IT IS ORDERED that Plaintiff's request for leave to amend its complaint to add *only* a claim for implied breach of warranty is GRANTED. Plaintiff is DIRECTED to file an amended complaint by **October 9, 2018**.

IT IS FURTHER ORDERED that the parties are DIRECTED to meet and confer to develop a Fed. R. Civ. Pro. 26(f) conference plan for the case to proceed to discovery and to appear for a telephonic conference on **October 23, 2018 at 4:00 pm**.


　　　　　　　　　　　　　　　s/Robert H. Cleland
　　　　　　　　　　　　　　　ROBERT H. CLELAND
　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE
Dated:  September 28, 2018


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 28, 2018, by electronic and/or ordinary mail.


　　　　　　　　　　　　　　　s/William Barkholz for Lisa Wagner
　　　　　　　　　　　　　　　Case Manager and Deputy Clerk
　　　　　　　　　　　　　　　(810) 292-6522