STACKPOLE INT'L ENGINEERED
PRODUCTS, LTD.,

      Plaintiffs/Counter-Defendant,

v.                                                    Case No. 17-13748

ANGSTROM AUTOMOTIVE
GROUP, LLC,

      Defendant,

and

ANGSTROM PRECISION
METALS, LLC,

      Defendant/Counter-Plaintiff

_____/

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Stackpole International Engineered Products, LTD, ("Stackpole") is an automotive supplier. It was engaged in several commercial agreements with Defendants Angstrom Automotive Group, LLC, ("AAG") and Angstrom Precision Metals, LLC, ("APM"). In these agreements, Stackpole ordered parts necessary to build engine oil pumps. The relationship broke down and both sides now seek to hold the other liable for alleged breaches of contract. Stackpole also seeks to hold Defendants liable for a breach of implied warranty.

Now before the court are cross motions for summary judgment. The parties thoroughly briefed the motions. (ECF Nos. 51, 56, 57, 58, 59, 60.) The court found a hearing unnecessary. E.D. Mich. L.R. 7.1(f)(2). For the following reasons, the court will deny Stackpole's motion for summary judgment as to Stackpole's breach of contract claim but will grant Stackpole's motion as to AAG's participation in the agreements. The court will grant in part and deny in part Stackpole's motion as to APM's counterclaim. For Defendants, the court will deny their motion for summary judgment as to Stackpole's breach of contract claim and as to AAG's participation in the agreements. However, the court will grant Defendants' motion on Stackpole's implied warranty claims.

## I. PROCEDURAL HISTORY

Stackpole filed its complaint in November 2017. (ECF No. 1.) In it, Stackpole alleged breach of contract (Count I), breach of express warranty (Count II), and claim and delivery (Count III). (*Id.*) Within three months, Defendants moved to dismiss the complaint and Stackpole filed a motion for partial summary judgment. (ECF Nos. 11, 14.)

In September 2018, the court issued an opinion that denied without prejudice Stackpole's motion for summary judgment and granted in part and denied in part Defendants' motion to dismiss. (ECF No. 24.) The court found that Stackpole had plausibly alleged AAG was a valid party to this suit. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (ECF No. 24, PageID.475.) It also found that Stackpole had pled a viable claim for breach of contract. (*Id.*, PageID.478.) However, the court found that Stackpole lacked a valid basis for breach of express warranty (Count II) and claim and

delivery (Count III). (*Id.*, PageID.486.) The court did leave open the possibility of an amended complaint. (*Id.*, PageID.489.) The court further found insufficient evidence to grant Stackpole's motion for summary judgment. (*Id.*, PageID.484.) It denied Stackpole's motion without prejudice and allowed the parties to proceed with discovery. (*Id.*, PageID.486.)

Soon after the court's September 2018 opinion, APM filed a counterclaim, alleging breach of contract on the part of Stackpole. (ECF No. 36.) Stackpole amended its complaint to add two claims of implied warranty of merchantability. Stackpole narrowed its claim and delivery suit in accordance with the court's opinion as well.

After almost ten months of discovery, Stackpole now moves for summary judgment again. (ECF Nos. 56.) It alleges that it is entitled to a judgment as a matter of law as to its breach of contract claim. Stackpole also seeks to dismiss APM's counterclaim. At issue is whether AAG is a valid party to this suit and whether Defendants' actions amounted to a breach.

Defendants filed their own motion for summary judgment at the same time as Stackpole. (ECF No. 51.) They assert that Stackpole's claims for breach of contract and breach of implied warranty fail for lacking genuine disputes of material fact. Fed. R. Civ. P. 56(a). Defendants ask the court to dismiss the claims against AAG given that AAG was allegedly not a party to the contracts at issue.

## II. BACKGROUND

Both Stackpole and Defendants are participants in the automotive sector's supply chain. Stackpole is a tier-1 automotive supplier that, among other things, manufactures transmission and engine oil pumps. (ECF No. 35, PageID.644-6.) These pumps are

then sold to original equipment manufacturers ("OEM") on their way toward being incorporated into vehicles for use on the streets. (*Id.*) In order to build these pumps, Stackpole sought suppliers for three parts. These parts were labeled 806670 or "T70 Parts," 140665 or "10R/10L Parts," and 116122 or "Nano Parts." (*Id.*, PageID.645.)

AAG is a parent company with several subsidiary affiliates, including APM. (ECF No. 35, PageID.652; ECF No. 56-3, PageID.1282-83.) APM served as the actual component supplier while AAG oversaw and managed corporate level decisions. (ECF No. 35, PageID.645, 652; ECF No. 56-3, PageID.1282-83; ECF No. 56-6, PageID.1308.)

The contracts at issue had their origin in June 2014 when Stackpole sent a quote to Defendants, asking for pricing estimates on the production of the parts. (ECF No. 51-3, PageID.1055.) In response, APM submitted pricing quotes for the 10R Parts and the Nano Parts. (ECF No. 51-7, PageID.1079; ECF No. 51-8, PageID.1081.) APM and Stackpole had a preexisting contract to produce T70 Parts. (ECF No. 51, PageID.1010; ECF No. 56, PageID.1242; ECF No. 51-2, PageID.1050.) AAG maintained ultimate responsibility for deciding quotes submitted by APM. (ECF No. 56-2, PageID.1273.; ECF No. 57-4, PageID.1514.) Stackpole and AAG negotiated the specifics of the potential deal and eventually signed an agreement in the form of a Letter of Intent ("LOI"). (ECF No. 56-6, PageID.1308; ECF No. 57-13, PageID.1590-93; ECF No. 58-6, PageID.1717-1719; ECF No. 58, PageID.1638.) The LOI was signed between Stackpole and AAG, but was made with the understanding that APM would manufacture the parts. (ECF No. 51-10, PageID.1088-89; ECF No. 51-4, PageID.1058; ECF No. 51-

5, PageID.1071.) AAG was merely the management umbrella for APM and did not negotiate to manufacture the products itself. (ECF No. 56-3, PageID.1282.)

The LOI detailed prices and quantities for the three parts. Stackpole agreed to order 1.1 million 10R Parts for $1.66 per part and 306,000 Nano Parts for $3.08 per part. (ECF No. 51-10, PageID.1088-89.) Defendants agreed to a three-year price reduction for the preexisting T70 Part business. (*Id.*) The LOI further identified 10R Parts and Nano Parts discounts for Stackpole that would take place over the course of the next three years as APM improved its productivity. (*Id.*; ECF No. 58, PageID.1660-61.) The contract contemplated later agreements between Stackpole and Defendants. It mentioned "Purchase Orders and Stackpole Production blanket purchase orders will be issued for each part at a later date." (ECF No. 51-10, PageID.1089.) Notably, the LOI did not detail the manufacturing process that would be used by APM to make the parts. (ECF No. 51-10, PageID.1088-89.) It also did not include a provision for Stackpole to share the cost of production with Defendants. (*Id.*) A termination date was not included either. (*Id.*)

After the LOI was signed, Stackpole followed through and placed an order to APM to produce the relevant parts. Stackpole sent APM three purchase orders ("POs") by June 2015. (ECF Nos. 56-8, 56-9, 56-10.) These POs were not signed and returned by either Defendant. (*See* ECF No. 56-8, PageID.1323; ECF No. 56-9, PageID.1337; ECF No. 56-10, PageID.1348.) Nonetheless, as this court pointed out in its earlier opinion, APM's subsequent performance of the POs and Stackpole's acceptance of APM's shipments established a valid contractual relationship. (ECF No. 24, PageID.487-88; ECF No. 51, PageID.1018.) Thus, Stackpole and APM (at a minimum)

were bound by the provisions of the POs, minus the terms included in the "Supplemental Terms and Conditions." (ECF No. 24, PageID.487-88.) Importantly, all three POs referenced the original LOI between Stackpole and AAG. (ECF No. 56-8, PageID.1314; ECF No. 56-9, PageID.1327; ECF No. 56-10, PageID.1340.)

APM followed through with its supply to Stackpole for roughly the next two years. However, the production of the parts began to put strains on Defendants' businesses. By April 2017, Defendants were unable to profitably produce the parts necessary to meet their obligations to Stackpole. (ECF No. 57-14, PageID.1597; ECF No. 56-21, PageID.1409.; ECF No. 56-23, PageID.1420.) AAG informed Stackpole that APM would not continue production of the parts unless Stackpole agreed to a price increase. (ECF No. 24, PageID.472; ECF No. 25, PageID.499; ECF No. 56-21, PageID.1409.) Over the course of May 2017, AAG clarified its demands, ultimately asking for a price increase of $1.63 per part. (ECF No. 56-25, PageID.1425; ECF Nos. 56-22, PageID.1413; 56-24, PageID.1423.) Through April and May 2017, AAG made it explicitly known to Stackpole that Defendants required a price increase or APM would shut down manufacturing operations. (ECF No. 56-21, PageID.1409 ("The second option is that we will wind down the whole operation."); ECF No. 56-22, PageID.1413 (Defendants' production labeled as a "Going Concern" if Defendants do not receive a price increase); ECF No. 25, PageID.499 ("In April and May 2017, Angstrom verbally informed Stackpole that it would no longer supply the Parts to Stackpole unless Stackpole agreed to Angstrom's . . . price increase.").)

In response, Stackpole made it known to Defendants that it would only agree to a price increase under protest. (ECF No. 56-26, PageID.1427 (Letter from Stackpole on

May 31, 2017 indicating that if Stackpole must pay a higher price for the parts, "then it will have to do so under protest.").) Stackpole, operating in the middle of the automotive sector's manufacturing process, needed to ship its parts "just in time" for the next stage of production. (ECF No. 27, PageID.552-53.; ECF No. 56-26, PageID.1427 ("'[Defendants'] commitment to supply is critical to protect our consumer.").) Any delay in Stackpole's shipments would endanger the entire supply chain's tightly regimented time schedule. (ECF No. 27, PageID.552-53.; ECF No. 56-26, PageID.1427; ECF No. 56-6, PageID.1309 (threatening to cut off supply effectively meant "a gun was put to [Stackpole's] head."); ECF No. 57-5, PageID.1530 (Defendants "forced [Stackpole's] hand.").) Missing deadlines would risk permanent loss of business for Stackpole. *Id.*

Stackpole and AAG then negotiated a new agreement, called the "Wind-Down Agreement." (ECF No. 56-3, PageID.1286-87 (AAG's Chief Commercial Officer describing negotiations between AAG and Stackpole regarding the Wind Down Agreement); ECF No. 56-27.) Signed by APM and Stackpole on June 6th and 7th, 2017, respectively (with AAG's address on the agreement's letterhead), the new agreement set higher prices for the parts and set an end date for September 30, 2017. (ECF No. 56-27, PageID.1429; ECF No. 56, PageID.1251; ECF No. 58, PageID.1656.) Stackpole agreed to Defendants' demand of an increase of $1.63 per part. (ECF No. 56-27, PageID.1429.) This constituted a price increase over 100% for the supply of T70 Parts and 10R Parts, as well as over 50% for Nano Parts. (*Id.*) The parties agreed to end their commercial relationship by the end of September 2017. (*Id.*) The end of the agreement explicitly stated that Stackpole "enter[ed] [the] agreement under duress and protest." (ECF No. 56-27, PageID.1430.)

Stackpole and Defendants fulfilled the obligations in the agreement, with APM providing the remaining parts ordered and Stackpole paying the increased pricing. (ECF No. 51, PageID.1022; ECF No. 57, PageID.1473.) Stackpole did refuse to pay some amounts owed under the Wind Down Agreement for APM's equipment expenses. (ECF No. 40, PageID.723-24.) At the completion of the Wind Down Agreement, Stackpole filed this instant action against both Defendants. (ECF No. 1.)

## II. STANDARD

To prevail on a motion for summary judgment, a movant must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the initial burden of presenting evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no requirement that the moving party "support its motion with [evidence] *negating* the opponent's claim." *Id.*; *see also Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere possibility' of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). To pass summary judgment, "the evidence [must be] such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson*, 477 U.S. at 248. All reasonable inferences that can be drawn from the underlying facts must be done "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

## IV. DISCUSSION

Stackpole's and Defendants' motions address mostly the same issues. Both parties seek summary judgment as to Stackpole's breach of contract claim and both seek summary judgment as to AAG's participation in the agreements at issue. Stackpole includes an additional request for summary judgment against APM's breach of contract counterclaim. Defendants ask for summary judgment as to Stackpole's implied warranty claims.

The court will first consider both Stackpole's and Defendants' motions for summary judgment as to Stackpole's breach of contract claim and AAG's participation in the agreements. It will then turn to Stackpole's motion for summary judgment as to APM's breach of contract counterclaim. Finally, the court will determine Defendants' motion for summary judgment as to Stackpole's implied warranty claims.

### A. Stackpole's Breach of Contract Claim

Stackpole's claim for breach of contract arises under Michigan law. *Shady Grove Orthopedic Assocs. v. Allstate Ins.*, 559 U.S. 393, 417 (2010) ("Federal courts sitting in diversity apply state substantive law."). In Michigan, a breach of contract allegation requires proof that "(1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Constr., Inc.*, 495 Mich. 161, 178, 848 N.W.2d 95 (2014) (citing *Stevenson v.*

*Brotherhoods Mut. Benefit*, 312 Mich. 81, 90-91, 19 N.W.2d 494 (1945)). In order to prove the creation of a contract, there must be "(1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Bank of America, NA v. First Am. Title Ins. Co.*, 499 Mich. 74, 101, 878 N.W.2d 816 (2016) (citing *AFT Mich. V. Michigan*, 497 Mich. 197, 235, 866 N.W.2d 782 (2015)). Mutuality of agreement incorporates the understanding that a contract "must have 'a meeting of the minds on all essential terms of a contract.'" *Calhoun County v. Blue Cross Blue Shield Mich.*, 824 N.W.2d 202, 209 (Mich. Ct. App. 2012) (quoting *Burkhardt v. Bailey*, 680 N.W.2d 453, 463 (Mich. Ct. App. 2005)); *see also Hall v. Small*, 705 N.W.2d 741, 743 (Mich. Ct. App. 2005). "'Meeting of the minds' is a figure of speech for mutual assent." *Hall*, 705 N.W.2d at 743 (quoting *Kamalnath v. Mercy Mem. Hosp. Corp.*, 487 N.W.2d 499, 503 (Mich. Ct. App. 1992)). "A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Calhoun County*, 824 N.W.2d at 209. Mutuality of obligation is largely redundant with consideration. *Hall*, 705 NW.2d at 744 (quoting *Teed v. Citizens Ins. Co. of America*, 449 N.W.2d 22, 25 (Mich. Ct. App. 1993)) ("By 'mutuality of obligation' is apparently meant that there must be consideration.").

There is no genuine dispute that a contract existed between Stackpole and Defendants. Fed. R. Civ. P. 56(a). Stackpole, AAG, and APM are highly sophisticated corporate entities. They negotiated and committed themselves to contracts for the supply of auto parts. (ECF No. 56-6, PageID.1308; ECF No. 57-13, PageID.1590-93; ECF No. 58-6, PageID.1717-1719; ECF No. 58, PageID.1638.; ECF Nos. 56-8, 56-9,

56-10.) Through the LOI and the POs, Stackpole agreed to give money in exchange for timely supply of the parts. (ECF No. 56-6, PageID.1308; ECF No. 57-13, PageID.1590-93; ECF No. 58-6, PageID.1717-1719; ECF No. 58, PageID.1638.; ECF Nos. 56-8, 56-9, 56-10.) There is no indication on the record that parties lacked competence, that the subject matter of the agreement was improper in any way, or that any illegal consideration was involved. *Bank of America*, 499 Mich. at 101.

The LOI, as supplemented by the subsequent POs, satisfied mutuality of agreement and obligation as well. *Id.* Both AAG and APM were bound to the agreement to ship T70, 10R, and Nano Parts in exchange for the prices listed in the LOI and rearticulated in the POs. While APM was the entity that produced the parts, AAG served as the corporate manager, negotiating and deciding the nature of both Defendants' obligations. (ECF No. 56-2, PageID.1273.; ECF No. 56-6, PageID.1308; ECF No. 57-13, PageID.1590-93; ECF No. 58-6, PageID.1717-1719; ECF No. 58, PageID.1638.; ECF No. 56-3, PageID.1282-83.) AAG alleges that it was not a party to any contractual exchange with Stackpole, thus lacking "mutual assent" to contract with Stackpole. *Hall*, 705 N.W.2d at 743. Although it can hardly be debated that the exchange of money for parts is valid consideration, AAG's logic also leads to the conclusion that it lacks mutuality of obligation. *See General Motors Corp. v. Dep't of Treasury, Revenue Division*, 466 Mich. 231, 239, 644 N.W.2d 734 (2002) (quoting *Whitney v. Stearns*, 16 Me. 394, 397 (Mich. 1839)) ("It has been said '[a] cent or a pepper corn, in legal estimation, would constitute a valuable consideration.'"). If AAG is not a party to the agreements, it never had anything to exchange with Stackpole to begin with.

AAG's allegation is belied by substantial evidence to the contrary. Sandra Bradford, AAG's Chief Commercial Officer, stated that AAG "basically runs" and acts "like a corporate headquarters" for sub-entities like APM. (ECF No. 56-3, PageID.1282.) According to her, APM and entities like it "aren't really authorized to bind themselves without somebody from [AAG] looking over it." (*Id.*, PageID.1282-1283.) Further, APM does not have its own officers, although it did have employees to oversee the manufacturing plants. (*Id.*, PageID.1282; ECF No. 58-7, PageID.1722.) Any contracting, purchasing, or termination of contracts on the part of APM required approval from an officer from AAG. (ECF No. 56-3, PageID.1283.) Herb Searson, AAG's VP of Business Development, stated that any decision to purchase capital equipment necessary to meet the obligations to Stackpole was made by AAG, not APM. (ECF No. 56-2, PageID.1275; *see also* ECF No. 58-7, PageID.1729 (AAG's President confirming he would sign off on any capital expenditures by APM).) Mr. Searson also said that AAG had ultimate responsibility in determining quotes sent to Stackpole at the beginning stages of negotiation. (ECF No. 56-2, PageID.1273 (referring specifically to 10R Parts).) Rajneesh ("Raj") Banga, AAG's Vice President, confirmed this, although he did mention that APM provided important information and suggestions. (ECF No. 57-4, PageID.1514 (referring generally to quoting responsibilities).) Stackpole's Purchasing Manager, Matt MacDonald, testified that any negotiation or discussion regarding the part orders, "[a]nything to do commercially was with [AAG] personally." (ECF No. 56-6, PageID.1308.) Emails between Raj Banga and Matt MacDonald indicate that AAG negotiated the LOI with Stackpole. (ECF No. 58-6, PageID.1717-1719.) Defendants

admit as much in their briefing, but still maintain that AAG acted solely as an agent for APM. (ECF No. 58, PageID.1638, ¶ 2.)

AAG continued to be the primary contact point and decision maker during the course of performance. It is uncontested that AAG updated Stackpole on production levels and potential investments into new equipment on the part of APM.[1] (ECF No. 56-11, PageID.1351-64; ECF No. 56-16, PageID.1387-1391; ECF No. 56-20, PageID.1402-03; ECF No. 58-20, PageID.1837; 58-35, PageID.1895-98.) It was also AAG who gave the first indications to Stackpole that there were issues with profitability with APM's manufacture of the parts. (ECF No. 57-14, PageID.1597.) It was then AAG who approached Stackpole, made the demands for higher prices, and negotiated the Wind Down Agreement. (ECF No. 24, PageID.472; ECF No. 56-21, PageID.1409; ECF No. 25, PageID.499; ECF No. 56-22, PageID.1413; ECF No. 56-25, PageID.1425; ECF Nos. 56-24; ECF No. 56-3, PageID.1286-87; ECF No. 56-27.) AAG's President, Nagesh Palakurthi, admitted that any decision to withhold parts, the threat precipitating the need for a Wind Down Agreement, would have been made by him or Ms. Bradford (AAG's Chief Commercial Officer). (ECF No. 56-23, PageID.1421.)

It is true that AAG's employees assert in their testimony that they acted only as "agents" for APM. (ECF No. 56-3, PageID.1282.; ECF No. 58-4, PageID.1696.) Defendants submit an affidavit from Mr. Palakurthi (AAG's President) where he testifies

---

[1]    APM did communicate with Plaintiff at times. However, it did so in a technical capacity, following up on the obligations contained in the agreement and higher-level discussions between AAG and Plaintiff. (*See, e.g.*, ECF Nos. 58-51, 58-52 (APM sending Plaintiff technical details on proposed manufacturing equipment in the context of AAG and Plaintiff discussing approval of the equipment for use (ECF No. 58-23, PageID.1847-48.)).)

that APM negotiated, contracted, and contacted Stackpole through the course of performance. (ECF No. 51-20.) If read literally, this goes against the massive weight of evidence that directly indicates AAG was the leading player, including testimony from other AAG top executives and Mr. Palakurthi himself. Instead, Mr. Palakurthi appears to be asserting in conclusory fashion, again, that AAG, as an agent to APM, commanded the relationship with Stackpole. Following this line of thinking, Defendants admit in their briefing that AAG negotiated with Stackpole on the creation of the LOI and the Wind Down Agreement, but did so as an agent to APM. (ECF No. 58, PageID.1638, ¶ 2; ECF No. 58, PageID.1652-54, ¶¶ 38, 39, 43.)

Bare legal conclusions do not impact the court's determination of an agency relationship. *Anderson*, 477 U.S. at 252 (1986); *Mitchell*, 964 F.2d at 582 (6th Cir. 1992); *see also St. Clair Intermediate Sch. Dist.*, 458 Mich. 540, 557-58, 581 N.W.2d 707 (1998) (making a legal determination on the formation of an agency relationship). As the nonmoving party, Defendants have the burden of coming forward with substantive evidence to show that it was merely a faithful agent, severed from privity to the contracts at issue. *Matsushita*, 475 U.S. at 587. Even in a light most favorable to AAG, no reasonable jury could find AAG's behavior to be that of mere agent. *Diebold, Inc.*, 369 U.S. at 655; *Anderson*, 477 U.S. at 248. "[F]undamental to the existence of an agency relationship is the right to control the conduct of the agent." *St. Clair Intermediate School Dist.*, 458 Mich. at 558, 581 (citing *Capitol City Lodge No. 141, FOP v. Meridian Twp.*, 282 N.W.2d 383, 387 (Mich. Ct. App. 1979)); *Little v. Howard Johnson Co.*, 455 N.W.2d 390, 393 (Mich. Ct. App. 1990) (citing *Avery v. American Honda Motor Car Co.*, 327 N.W.2d 447, 448 (Mich. Ct. App. 1982) ("In Michigan, the

test for a principal-agent relationship is whether the principal has the right to control the agent."). Furthermore, the agent must "obey the instructions of his principal." *Burton v. Burton*, 332 Mich. 326, 337, 51 N.W.2d 297 (1952); *see also* Restatement (Third) of Agency § 8.09(2) (Am. Law Inst. 2006).

The facts, if anything, show that APM was "control[ed]" and "obeyed the instructions" of AAG. *St. Clair Intermediate School Dist.*, 458 Mich. at 558; *Burton*, 332 Mich. at 337. AAG had full control over the contracting, price setting, purchasing, capital investment, and contract termination of APM. (ECF No. 56-3, PageID.1282-83; ECF No. 56-2, PageID.1273, 1275; ECF No. 58-7, PageID.1729; ECF No. 57-4, PageID.1514; ECF No. 56-6, PageID.1308.) AAG negotiated the agreements with Stackpole and made the ultimate decision on whether to exit them. (ECF No. 56-2, PageID.1273.; ECF No. 56-6, PageID.1308; ECF No. 57-13, PageID.1590-93; ECF No. 58-6, PageID.1717-1719; ECF No. 58, PageID.1638.; ECF No. 56-3, PageID.1282-83; ECF No. 56-21, PageID.1409; ECF No. 25, PageID.499; ECF No. 56-22, PageID.1413; ECF No. 56-25, PageID.1425; ECF Nos. 56-24; ECF No. 56-3, PageID.1286-87; ECF No. 56-27.) Thus, there is no genuine dispute that AAG was not an agent of APM. Fed. R. Civ. P. 56(a).

Further, AAG was a party to the agreements at issue. First, AAG signed a valid contract with Stackpole through the LOI. "A letter of intent may be characterized as an agreement to agree at a later date and is as valid as any other contract." *Zander v. Ogihara Corp.*, 540 N.W.2d 702, 705 (Mich. Ct. App. 1995) (citing *Opdyke Inv. Co. v. Norris Grain Co.*, 413 Mich. 354, 359-60, 320 N.W.2d 836 (1982)). "The fact that additional contracts may have been contemplated and mentioned in the letter does not invalidate any agreement actually reached." *Opdyke*, 413 Mich. at 359. Here, AAG and

Stackpole signed and agreed to essential aspects of a contract. The LOI identified the goods to be manufactured: the T70 Parts, the 10R Parts, and the Nano Parts. (ECF No. 51-10, PageID.1088.) It provided specific prices Stackpole would pay, 10R Parts for $1.66 per part and Nano Parts for $3.08 per part, and discount amounts for all parts. (*Id.*) It identified quantities, including 1.1 million 10R Parts and 306,000 Nano Parts. (*Id.*)

Second, the LOI identified the later PO agreements. (*Id.*, PageID.1089.) This effectively served as AAG's performance to its LOI obligations. Looking to the plain terms of the contract, the LOI explicitly recognized that subsequent purchase orders would be made to follow up the agreement. (*Id.* ("Purchase Orders and Stackpole Production blanket purchase orders will be issued for each part at a later date.")) *See Rory v. Continental Ins. Co.*, 473 Mich. 457, 469, 703 N.W.2d 23 (2005) ("In ascertaining the meaning of a contract, we give the words used in the contract their plain and ordinary meaning."); *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 51, 664 N.W.2d 776 (2003) ("[T]he courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy."). In return, the POs themselves reference back to the LOI and its terms. (ECF Nos. 56-8, PageID.1314 ("Price based on productivity give back of 1.5% as per Letter of Intent."); ECF No. 56-9, PageID.1327 ("Reference Letter of Intent."); ECF No. 56-10, PageID.1340 ("Reference Letter of Intent.").) Thus, the POs, which this court has already determined to be valid contracts, and the LOI are contracts held in conjunction as the same agreement. (ECF No. 24, PageID.487-88.) "When one writing references another instrument for additional contract terms, the two writings should be read together." *Forge v. Smith*, 458 Mich. 198, 207, 580 N.W.2d 876 (1998) (citing *Whittlesey*

*v. Herbrand Co.*, 217 Mich. 625, 628, 187 N.W. 279 (1922)). Here, both sets of agreements, the LOI and the POs, reference and incorporate each other.

Through both AAG's signature on the LOI and its de-facto control over APM, AAG and APM entered into a valid agreement to supply auto parts to Stackpole. Mutuality of agreement and obligation are satisfied for all parties. *Bank of America*, 499 Mich. at 101. No reasonable juror could decide otherwise. *Anderson*, 477 U.S. at 248.

The issue that prevents this court from reaching complete summary judgment in favor of Stackpole is the element of breach. *Miller-Davis Co.*, 495 Mich. at 178. The LOI and the POs provide no termination date for the supply of parts to Stackpole through 2017. (ECF No. 24, PageID.480-81; ECF No. 51-10, PageID.1088-89; ECF Nos. 56-8, PageID.1314-15; ECF No. 56-9, PageID.1327-28; ECF No. 56-10, PageID.1340-41.) There are also no terms for the process in which the agreements are to be terminated. (ECF No. 51-10, PageID.1088-89; ECF Nos. 56-8, PageID.1314-15; ECF No. 56-9, PageID.1327-28; ECF No. 56-10, PageID.1340-41.) The POs do provide Stackpole, in their plain language, the right to terminate without penalty, but the issue in this case is Defendants' rights to terminate.[2] *Rory*, 473 Mich. at 469. (ECF Nos. 56-8, PageID.1314 ("Order may be cancelled at no Penalty *to buyer* beyond material release authorization") (emphasis added); ECF No. 56-9, PageID.1327 ("Order may be cancelled at no Penalty

---

[2]      Providing Plaintiff greater power to terminate by no means undermines the mutuality of obligation, as Defendants claim. Defendants contracted to provide auto parts in exchange for money. This is sufficient consideration to satisfy the mutuality of obligation requirement. *General Motors Corp.*, 466 Mich. at 239. Contracting parties are not required to have mirroring rights and obligations. *Harris v. Chain Store Realty Bond & Mortg. Corp.*, 329 Mich. 136, 145, 45 N.W.2d 5 (1950) ("When two competent parties, through a process of give and take, reach an agreement[,] it can be presumed that the mutual promises were considered adequate.")

*to buyer* beyond material release authorization") (emphasis added); ECF No. 56-10, PageID.1340 ("Order may be cancelled at no Penalty *to buyer* beyond material release authorization") (emphasis added).) It was Defendants who placed demands on Stackpole to accept a price increase or risk losing the continued supply of parts. (ECF No. 56-3, PageID.1286; ECF No. 56-21, PageID.1409; ECF No. 56-22, PageID.1413; ECF No. 25, PageID.499.)

Contracts that provide for successive performances, but are indefinite in duration, may be terminated at any time. Mich. Comp. Laws § 440.2309(2). Here, the LOI requires Defendants to supply the parts in successive deliveries until either Stackpole cancels the contract or the quantities listed are met. (ECF No. 51-10, PageID.1088-89.) There is no definite duration provided, thus Defendants could terminate the contract at-will. Mich. Comp. Laws § 440.2309(2). However, given the possibility that an at-will termination power may suddenly upend parties heavily reliant on a contract, the Michigan UCC added a notice requirement. When contracts do not otherwise specify the process of termination, the party attempting to terminate the contract must be provided reasonable notice.[3] Mich. Comp. Laws § 440.2309(3).

This is the situation for which the reasonable notice requirement was created. Defendants threatened to terminate the agreement to supply parts unless Stackpole

---

[3]     If Plaintiff terminated the contract, it would be bound by the plain language of the POs, which applies specifically to Plaintiff. *Rory,* 473 Mich. at 469; Mich. Comp. Laws § 440.2309(3) ("Termination of a contract by one party *except on the happening of an agreed event* requires reasonable notification.") (emphasis added); *see also Advanced Plastics Corp. v. White Consol. Industries, Inc.*, 828 F.Supp. 484, 491 (E.D. Mich. 1993) ("[B]ecause [] notice . . . to cease contractual relation[s] was consistent with the terms of the contract, it is reasonable."). (ECF No. 56-8, PageID.1314; ECF No. 56-9, PageID.1327; ECF No. 56-10, PageID.1340.)

agreed to a new contract at higher prices. (ECF No. 56-21, PageID.1409; ECF No. 56-22, PageID.1413; ECF No. 56-25, PageID.1425; ECF Nos. 56-24, PageID.1423.) The original agreement was in fact terminated on June 7, 2017, when the Wind Down Agreement took effect. (ECF No. 56-27, PageID.1429.) Without proper notice, Stackpole, as a supplier in the middle of a long supply chain, would effectively be held at the mercy of Defendants. Stackpole would need to agree to higher prices or suffer potentially catastrophic consequences to its business. (ECF No. 56-26, PageID.1427; ECF No. 56-6, PageID.1309; ECF No. 57-5, PageID.1530.) The law demands that Stackpole be given an opportunity to deliberate and chose a more mutually beneficial alternative supplier. Mich. Comp. Laws § 440.2309.

Stackpole claims the facts leave no genuine dispute as to whether notice was reasonable. However, Stackpole's own complaint admits that Stackpole was notified of the potential threat of ceased shipments in April 2017. (ECF No. 25, PageID.499 ("*In April and May 2017*, Angstrom verbally informed Stackpole that it would no longer supply the Parts to Stackpole unless Stackpole agreed to . . . price increases.") (emphasis added).) Letters and communications between Defendants and Stackpole confirm this. (ECF No. 56-22, PageID.1413; ECF No. 56-24, PageID.1423; ECF No. 56-25, PageID.1425; ECF No. 56-26, PageID.1427.) Given that the contract was terminated on June 7, 2017, Stackpole was given over a month's notice, at a minimum. (*See also* ECF No. 24, PageID.472.)

The reasonableness of notice is generally a question of fact for a jury. *Bev Smith, Inc. v. Atwell*, 836 N.W.2d 872, 879 (Mich. Ct. App. 2013) (citing *Moore v. First Security Cas. Co.*, 568 N.W.2d 841, 845 (Mich. Ct. App. 1997). In fact, the Michigan UCC

explicitly confines a determination of "reasonable time" to the "nature, purpose, and circumstances of the action." Mich. Comp. Laws § 440.1205(1). In accordance with this principle, courts have declined to issue summary judgment as to the reasonableness of notice when notice was given the same day as termination. *Sundram Fasteners Ltd. v. Flexitech, Inc.*, 2009 WL 2351763, at *7 (E.D. Mich. July 29, 2009) (Cleland, J.) ("[D]ay-of notice of termination may indeed, in light of the nature of the parties' industry and the circumstances of industry-standard terminations, prove to be reasonable. The reasonableness of the notice cannot be determined without further development of facts, and is therefore inappropriate for summary judgment."). Although it is true that Defendants owed Stackpole a duty to provide notice adequate to shore up alternative suppliers, there remains a genuine dispute of fact as to whether Defendants fulfilled its duty. Fed. R. Civ. P. 56(a). Thus, summary judgment in favor of Stackpole cannot be granted in full.

There is no genuine dispute of fact that a contract was formed and the parties included Stackpole, APM, and AAG. Fed. R. Civ. P. 56(a). Whether Defendants breached the agreement by failing to provide reasonable notice remains to be decided.[4] Thus, the request for summary judgment in favor of both Defendants and Stackpole as to Stackpole's breach of contract claim will be denied.

---

[4] As to the third element of Plaintiff's claim, damages, Defendants admit that Plaintiff agreed to pay an additional $1,015,242.24 for the parts through the Wind Down Agreement. *Miller-Davis Co.*, 495 Mich. at 178. (ECF No. 56, PageID.1251, ¶ 51; ECF No. 58, PageID.1656-57, ¶ 51.) If Plaintiff were ultimately successful in its breach claim, these would be at least some of the resultant damages.

**B. APM's Breach of Contract Counterclaim**

APM's breach of contract claim against Stackpole revolves around the equipment APM used to produce the parts and the expenses incurred in producing the parts. First, APM alleges that Stackpole refused approval for an "agreed upon manufacturing process and instead insisted that APM use the [] more inefficient and expensive manufacturing process without granting any price concessions." (ECF No. 36, PageID.687.) Second, APM alleges Stackpole failed to pay for the expenses needed to manufacture the relevant parts, in violation of the Wind Down Agreement. (*Id.*)

APM's first claim has no basis in the text of the agreements. Neither the LOI nor the POs specify what manufacturing process Defendants can or cannot use in producing parts. (ECF No. 51-10, PageID.1088-89; ECF No. 56-8, PageID.1314-15; ECF No. 56-9, PageID.1327, 1329; ECF No. 56-10, PageID.1340-41.) They do not place restrictions or limitations as to how Stackpole would approve or disapprove of Defendants' manufacturing equipment. (ECF No. 51-10, PageID.1088-89; ECF No. 56-8, PageID.1314-15; ECF No. 56-9, PageID.1327, 1329; ECF No. 56-10, PageID.1340-41.) Nor do they detail any specific approval process by which Stackpole was required to abide generally. (ECF No. 51-10, PageID.1088-89; ECF No. 56-8, PageID.1314-15; ECF No. 56-9, PageID.1327, 1329; ECF No. 56-10, PageID.1340-41.)

Defendants argue prior negotiations and the contracts themselves implicate these requirements through references to productivity discounts and the amount of parts ordered. Putting aside the issue of admissibility of prior negotiations,[5] the

---

[5]    Michigan law disallows admission of a prior agreement or contemporaneous oral agreement if it is contradictory to a final agreement. Mich. Comp. Laws § 440.2202; *see also Hamade v. Sunoco Inc.*, 721 N.W.2d 233, 247 (Mich. Ct. App. 2006) (citing *UAW-*

communications that Defendants cite discuss only the price per part Stackpole would pay, the quantities of output expected, and the discounts to be provided to Stackpole. (ECF No. 58-2, PageID.1688; ECF No. 58-3, PageID.1690; ECF No. 58-11, PageID.1781-82.) They directly reflect the ultimate terms in the LOI and the subsequent POs. (ECF No. 51-10, PageID.1088-89; ECF No. 56-8, PageID.1314-15; ECF No. 56-9, PageID.1327, 1329; ECF No. 56-10, PageID.1340-41.) Although Defendants now claim these productivity discounts and quantities were premised on a specific manufacturing process, Defendants' subjective belief as to what the parties agreed to is not relevant. "[T]o determine whether there was mutual assent to a contract, 'we use an objective test, looking to the expressed words of the parties and their visible acts,' and ask whether a reasonable person could have interpreted the words or conduct in the matter that is alleged." *Rood v. General Dynamics Corp*, 444 Mich. 107, 119, 507 N.W.2d 591 (1993) (quoting *Rowe v. Montgomery Ward & Co.*, 437 Mich. 627, 640, 473 N.W.2d 268 (1991)).[6]

The uncontested evidence demonstrates that Defendants' own *internal* (i.e. subjective) discussions were the basis of their now alleged expectations at the time of contracting. Mr. Palakurthi, AAG's president, testified that the basis for his contention that the agreement was conditioned on Defendants' specific manufacturing process was

---

*GM Human Resource Ctr. V. KSL Recreation Corp.*, 579 N.W.2d 411, 414 (Mich. Ct. App. 1998)) ("[D]isappointed parties will have a great incentive to describe circumstances in ways that escape the explicit terms of their contracts.").

[6] Defendants also cite an email setting an agenda for negotiations on the LOI. However, that email only poses a question of "[h]ow does Angstrom propose to make [the 10R Parts]? [Whether] existing equipment or new purchase[?]" (ECF No. 58-10, PageID.1779.) No reasonable inference could interpret such a question as a binding legal obligation on the part of Plaintiff. *Moran*, 788 F.3d at 204.

"an *internal study* relative to previous experience." (ECF 56-23, PageID.1416 (emphasis added).) APM's plant manager, John Gingrich, who oversaw the manufacturing, testified similarly: "the quote [Defendants submitted in initial negotiations] is *worked internally*, the process is foreshadowed and determined if the plant would be capable of producing the part." (ECF 56-5, PageID.1295 (emphasis added).) There is simply no evidence of objective expression or act that would make a reasonable observer to the parties' negotiations or their final agreements think that Stackpole had assented to the terms Defendants are now alleging exist. *Rood*, 444 Mich. at 119. There is no indication Stackpole agreed to accept Defendants' preferred manufacturing process.

The court is also unconvinced that the parties' course of performance creates a genuine issue of fact that new contract terms were added. *See* Mich. Comp. Laws § 440.2202(a) (A final agreement "may be explained or supplemented by . . . course of performance."). It is true that, after contracting, Defendants were not given approval through the industry-standard Production Part Approval Process ("PAPP") for their manufacturing process. (ECF No. 56, PageID.1246, ¶ 25; ECF No. 58, PageID.1647-49, ¶ 25; ECF No. 56-2, PageID.1278.) However, there is no evidence that Stackpole was *required* to approve a specific machine offered up for approval by Defendants.

Further, there is no evidence Stackpole acted maliciously, in bad faith, or otherwise dishonestly in declining to issue PAPP approval. Instead, the uncontested facts indicate that Defendants never actually manufactured the parts necessary to obtain PAPP approval for Defendants' preferred manufacturing process. (ECF No. 56-16, PageID.1388 ("[G]rinding for these parts will be performed by an outside source. I think you will need to re PPAP once you bring this process in house"); ECF No. 56-5,

PageID.1303 (Mr. Gingrich, APM's plant manager, responding to a question: "[T]here was no 10R part produced by APM on a centerless grinder for that purpose[?] Correct."); ECF No. 56-2, PageID.1274 (Mr. Searson, AAG's VP of Business Development: "We were pressed for time and did not have the capability of grinding [the parts] in house.").) As Mr. Palakurthi, AAG's President, admitted, Stackpole "would need a statistical data of 300 parts" to provide PPAP approval. (ECF No. 56-23, PageID.1419.) "You have to make parts to make PPAP." (*Id.*)

For APM's second claim, Stackpole admits that it owes money if the Wind Down Agreement is enforceable. (ECF No. 40, PageID.723-24 ("Stackpole admits only that the "Wind-Down" document provided a mechanism for payment of the 10R tooling"; "Stackpole admits [] that it made a partial payment of approximately $52,000 for the 10R tooling.").) Nevertheless, Stackpole argues that the Wind Down Agreement was a result of a breach by Defendants when they terminated the original contract without reasonable notice. As discussed above, there is a genuine dispute of fact as to whether Defendants breached the original contract. Thus, the prerequisite to Stackpole's argument has not been satisfied and a genuine issue of material fact remains. Fed. R. Civ. P. 56(a).

Stackpole also argues that it signed the Wind Down Agreement under duress. Although Stackpole makes no attempt to include legal authority for this claim, the facts do show significant pressure put on Stackpole to accept the Wind Down Agreement. (ECF No. 56-26, PageID.1427; ECF No. 56-6, PageID.1309; ECF No. 57-5, PageID.1530.) Stackpole did note in the Wind Down Agreement that it only signed "under duress and protest." (ECF No. 56-27, PageID.1430.) However, duress is

reserved for only the most serious examples of coercion. "Duress exists when one by the unlawful act of another is induced to make a contract or perform some act under circumstances which *deprive him of the exercise of free will.*" *Norton v. Mich. State Highway Dept.*, 315 Mich. 313, 320, 24 N.W.2d 132 (1946) (emphasis added) (quoting *Hackley v. Headley*, 45 Mich. 569, 574, 8 N.W. 511 (1881)); *see also Hungerman v. McCord Gasket Corp.*, 473 N.W.2d 720, 721 (Mich. Ct. App. 1991). Although it is true that duress can occur in "the taking of undue advantage of the business or financial stress . . . of another," a reasonable juror could easily find that Stackpole was not deprived of its "free will." *Norton*, 315 Mich. at 320; *Anderson*, 477 U.S. at 248. Stackpole was a sophisticated party with at least one month's notice to consider its options. Summary judgment is not appropriate for such a contested issue. *Id.*

Given the fact that no reasonable juror could find that Stackpole was obligated to accept Defendants' preferred manufacturing process, APM's first counterclaim fails. *Anderson*, 477 U.S. at 248. However, a genuine dispute of material fact remains as to Stackpole's obligations under the Wind Down Agreement. Fed. R. Civ. P. 56(a). Thus, Stackpole's motion for summary judgment as to APM's counterclaim will be granted in part and denied in part.

### C. Stackpole's Implied Warranty Claims

Notice of nonconforming goods is required under Michigan law for a successful breach of implied warranty claim. Mich. Comp. Laws § 440.2607(3)(a); *Johnson Controls, Inc. v. Jay Indus., Inc.*, 459 F.3d 717, 724 (6th Cir. 2006). Internal emails between Stackpole's employees indicate that "[n]o notice [was given] to Angstrom." (ECF No. 51-25, PageID.1160.) Stackpole "admits that it did not provide notice to

Angstrom . . . outside of this litigation" and recognizes dismissal is appropriate. (ECF No. 57, PageID.1474.) There is no genuine dispute of material fact that Stackpole did not provide Defendants notice of nonconformity. Fed. R. Civ. P. 56(a). Defendants' motion for summary judgment as to Stackpole's implied warranty claims will be granted.

## V. CONCLUSION

Stackpole's claim for breach of contract survives summary judgment and must go forward. The issue has narrowed to the question of whether Defendants provided Stackpole reasonable notice of termination. There is no genuine dispute of fact that a contract was formed and that Stackpole, AAG, and APM were parties. Fed. R. Civ. P. 56(a). Summary judgment is appropriate as to part of APM's counterclaim for breach of contract, but not as to the whole counterclaim. There are no facts indicating that Stackpole was contractually obliged to accept Defendants' manufacturing process. However, Stackpole may still owe APM compensation through the Wind Down Agreement. Accordingly,

IT IS ORDERED that Plaintiff Stackpole's Amended Motion for Partial Summary Judgment (ECF No. 56) is GRANTED IN PART and DENIED IN PART. Summary judgment is GRANTED as to Defendant AAG's contractual obligations, and DENIED as to Stackpole's breach of contract claim. Summary judgment is GRANTED IN PART and DENIED IN PART as to Defendant APM's counterclaim.

IT IS FURTHER ORDERED that that Defendants' Motion for Partial Summary Judgment (ECF No. 51) is GRANTED IN PART and DENIED IN PART. Summary judgment is GRANTED as to Stackpole's implied warranty claims and DENIED as to

Stackpole's breach of contract claim and AAG's contractual obligations.

> s/Robert H. Cleland             /
> ROBERT H. CLELAND
> UNITED STATES DISTRICT JUDGE

Dated: December 3, 2019

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, December 3, 2019, by electronic and/or ordinary mail.

> s/Lisa Wagner                /
> Case Manager and Deputy Clerk
> (810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\17-13748.STACKPOLE.CrossSummaryJudgment.RMK3.docx